|  |  |
|---|---|
| **ROLANDO JIMENEZ**,<br><br>Plaintiff,<br><br>v.<br><br>**KEVIN McALEENAN, Acting Secretary,**<br>**U.S. Department of Homeland Security**,[1]<br><br>Defendant. | Case No. 17-cv-2731 (CRC) |

## <u>MEMORANDUM OPINION</u>

Rolando Jimenez alleges that he has been the victim of discrimination during his time as
an Immigration Officer with the Department of Homeland Security ("DHS"). He brings an array
of claims against the agency under Title VII of the Civil Rights Act and the Age Discrimination
in Employment Act ("ADEA"). Rather than move to dismiss, DHS answered Jimenez's
amended complaint and then moved for judgment on the pleadings or, in the alternative,
summary judgment. Jimenez opposes DHS's motion, largely on the ground that it would be
unfair to dismiss the case before he has had an opportunity to substantiate his claims through
discovery. Having carefully reviewed Jimenez's claims, the Court concludes that most of them
can be fully and fairly decided in DHS's favor without discovery. Accordingly, the Court will
grant judgment to DHS in large part, as explained below.

---

[1] Acting Secretary Kevin McAleenan is automatically substituted for his predecessor
Kirstjen Nielson, who resigned on April 8, 2019. <u>See</u> Fed. R. Civ. P. 25(d).

## I.  Background

### A.  Factual Background

Mr. Jimenez was born in 1963 in the Dominican Republic.  Am. Compl., ECF 6, ¶ 18.

He began working for the predecessor agency of U.S. Citizenship and Immigration Services

("USCIS"), a component of DHS, in 1996.  Id. ¶ 19.  He is currently an Immigration Officer in

USCIS's Fraud Detection National Security Headquarters based in Washington, DC.  Id. ¶ 20.

Jimenez's federal court complaint, which follows three agency EEO complaints filed in

2012, 2015, and 2017, alleges numerous instances of discrimination, retaliation, and harassment.

DHS has helpfully numbered these events one through twenty; Jimenez has adopted this

numbering convention for purposes of his opposition, and the Court will follow suit.

In his June 2012 EEO complaint, Jimenez alleged that DHS discriminated against him on

the basis of race, national origin, age, and reprisal for prior EEO activity when it: (Event 1)

improperly counseled him for misuse of government email; (Event 2) denied him the opportunity

to attend training sessions; and (Events 3 through 13) failed to select him for 11 separate

positions within the agency for which he applied.[2]  Id. ¶¶ 1, 21–29; see also Mot. Ex. 9 (2012

EEO Compl.), ECF 31-3, at 113[3] (checking boxes for race, national origin, age, and

retaliation/reprisal); Mot. Ex. 10 (2012 Agency Acceptance Letter), ECF 31-3, at 125.

In his 2015 EEO complaint, Jimenez alleged that his then first-line supervisor, Shari

Golston, who he says was aware of his prior EEO activity, see Am. Compl. ¶¶ 30–35, (Event 14)

falsely accused him of failing to turn in weekly reports and a telework agreement, id. ¶¶ 36–47,

---

[2] Jimenez does not identify these positions in his federal complaint.

[3] For consistency, the Court will cite to the ECF page numbers of the government's
exhibits to its motion.

and lying to her about speaking with an IT employee about a computer problem, id. ¶¶ 48–57. According to Jimenez, roughly a month after he filed the 2015 EEO complaint, Golston and Jimenez's second-line supervisor, Matthew O'Brien, again chastised him for failing to turn in periodic work reports; the EEO counselor on the case contacted Golston to inform her that Jimenez had complained of additional harassment based on these purportedly false accusations. Id. ¶¶ 59, 63–64.  (Event 15) A few weeks later, Golston allegedly contacted INTERPOL— where Jimenez was completing a two-year detail—to falsely accuse him of sending "Red Notices"[4] to a personal email account contrary to INTERPOL policy.  Id. ¶¶ 65–69.  This accusation, Jimenez said, led INTERPOL to terminate his detail 16 months early.  Id. ¶¶ 71–72. (Event 16) The following month, in July 2015, Golston purportedly denied Jimenez's request to attend a training session that other employees were permitted to attend.  Id. ¶¶ 79–81.  (Event 17) Finally, Jimenez alleged that he was the only employee in his branch to be denied access to an agency information system—the Homeland Security Data Network ("HSDN")—which is used to share sensitive but not classified information and which he says he needed to complete work assignments.  Id. ¶¶ 82–89.[5]

---

[4] "The purpose of an INTERPOL Red Notice is to seek the location and arrest of a person wanted by an international jurisdiction."  Mot. Ex. 81 (Report of Investigation), ECF 31-11, at 3.

[5] Originally, Jimenez's 2015 EEO complaint also alleged that in June 2015, his "mid cycle review was downgraded to a meets expectations" as reprisal for prior EEO activity.  Mot. Ex. 44, ECF 31-7, at 10.  Jimenez later withdrew this allegation.  See Mot. Ex. 50 (Plaintiff's Jan. 26, 2016 Aff. re: 2015 EEO Compl.), ECF 31-7, at 62.

Although Jimenez had two new supervisors as of Spring 2017, his grievances persisted. He filed another EEO complaint in June 2017,[6] alleging three instances of reprisal for his prior EEO activity. (Event 18) First, that he was suspended without pay in March 2017 based on Golston's "false reports" that he had sent Red Notices to his personal email account while on detail at INTERPOL. Id. ¶¶ 90–91. Then, that he was subjected to a hostile work environment from April 2017 to July 2017 because (Event 19) his new "management unfairly scrutinized his work" and (Event 20) imposed new job requirements that were impossible to meet because of that "unfair scrutiny." Id. ¶¶ 96–100. As a result, Jimenez charged, his supervisors downgraded his performance evaluation from "Achieved Excellence" to "Achieved Expectations." Id. ¶ 101.

Jimenez's federal complaint advances eight counts based on these twenty events: Title VII claims for retaliatory hostile work environment based on prior EEO activity (Count I), retaliation for prior EEO activity (Count II), discrimination based on race (Count III), hostile work environment based on race (Count IV), discrimination based on national origin (Count V), and hostile work environment based on national origin (Count VI); and ADEA claims for discrimination based on age (Count VII) and hostile work environment based on age (Count VIII). Jimenez's complaint does not specify which of the twenty events described above support which of his eight claims and instead incorporates by reference all preceding paragraphs into each claim.

In his briefing, Jimenez clarifies that he "does not claim age, race and national origin as bases" for Events 14 through 20, which comprise the allegations advanced in his 2015 and 2017

_____

[6] Technically, Jimenez filed one EEO complaint in April 2017 and a second in June 2017. See Mot. Ex. 68 (Apr. 7, 2017 EEO Compl.), ECF 31-9, at 51–52; Mot. Ex. 68 (Aug. 5, 2017 EEO Compl.), ECF 31-9, at 53–54. The agency accepted and consolidated the complaints in September 2017. See Mot. Ex. 69 (2017 Agency Acceptance Letter), ECF 31-9, at 58.

EEO complaints. Opp., ECF 27, at 14. Instead, he alleges only reprisal and retaliatory hostile work environment arising out of those events. See id. The Court takes this to mean that Counts III through VIII are based exclusively on the allegations set forth in his 2012 EEO complaint while Count I is based on the events alleged in the 2015 and 2017 complaints, see infra Part III(A)(2)(b), and Count II is based on the events identified in all three EEO complaints. For ease of reference, the following chart summarizes the Court's interpretation of Jimenez's underlying claims and corresponding administrative complaints.

| Count | Events | EEO Complaint |
|-------|--------|---------------|
| Count I: retaliatory hostile work environment | Events 14 through 20 | 2015, 2017 |
| Count II: retaliation for prior EEO activity | Events 1 through 20 | 2012, 2015, 2017 |
| Count III: racial discrimination | Events 1 through 13 | 2012 |
| Count IV: hostile work environment based on race | Events 1 through 13 | 2012 |
| Count V: national origin discrimination | Events 1 through 13 | 2012 |
| Count VI: hostile work environment based on national origin | Events 1 through 13 | 2012 |
| Count VII: age discrimination | Events 1 through 13 | 2012 |
| Count VIII: hostile work environment based on age | Events 1 through 13 | 2012 |

B. Procedural Background

Jimenez filed the operative amended complaint in April 2018, see Am. Compl., ECF 6, and the government answered in July 2018, see Answer, ECF 8. Then, before discovery

commenced and with leave of the Court, DHS moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), or, in the alternative, for summary judgment pursuant to Rule 56(a). <u>See</u> Mem. in Supp. of Mot. for J. Pleadings or Summ. J. ("Mot.), ECF 31-1.[7] Jimenez opposes the motion, which he treats exclusively as one for judgment on the pleadings because discovery has not commenced. <u>See</u> Opp. at 1, 11–13.[8] After much delay,[9] the motion is ripe for this Court's review.

## II. Standard of Review

A party may move for judgment on the pleadings after the pleadings are closed but early enough so as not to delay trial. Fed. R. Civ. P. 12(c).[10] A movant is entitled to judgment on the pleadings under Rule 12(c) if it "demonstrates that no material fact is in dispute and that it is entitled to judgment as a matter of law." <u>Schuler v. PricewaterhouseCoopers, LLP</u>, 514 F.3d 1365, 1370 (D.C. Cir. 2008) (quoting <u>Peters v. Nat'l R.R. Passenger Corp.</u>, 966 F.2d 1483, 1485

---

[7] The government's original dispositive motion appears at ECF 21. That filing contained a series of inadvertent errors. DHS filed an errata attaching corrected documents. <u>See</u> Errata, ECF 31. The Court will cite to the corrected documents for purposes of this Opinion.

[8] Jimenez's original opposition appears at ECF 24. Two days after filing that opposition, Jimenez sought leave to file an amended version, which the Court granted. <u>See</u> Feb. 5, 2019 Minute Order. The Court will cite to the amended opposition.

[9] DHS received four extensions to file the dispositive motion, <u>see</u> Mots. for Extension, ECF 17, 18, 19, 20, and filed an errata 14 weeks after filing that motion, <u>see</u> ECF 31; Jimenez received two extensions to file his opposition, <u>see</u> Mots. for Extension, ECF 22, 23, and received leave to file an amended opposition after-the-fact, <u>see</u> ECF 27; and finally, DHS received two extensions to file its reply, <u>see</u> Mots. for Extension, ECF 28, 29.

[10] Because the Court concludes that DHS is entitled to judgment as a matter of law on all but Jimenez's non-selection claims (which were not substantively briefed) and his retaliation claim based on his lack of access to the HSDN (about which there remains a factual dispute), it need not address the summary judgment standard of review under Federal Rule of Civil Procedure 56.

(D.C. Cir. 1992)).  The parties dispute whether this standard is more like that for a motion to dismiss under Rule 12(b)(6) or a motion for summary judgment under Rule 56.  The answer is that it depends.  "Rule 12(h)(2)[(B)] expressly authorizes a party to file a motion to dismiss for failure to state a claim pursuant to Rule 12(c)."  Saunders-El v. Rohde, 778 F.3d 556, 559 (7th Cir. 2015).  In other words, Rule 12(c) may serve as an "auxiliary or supplementary procedural device to determine the sufficiency of the case before proceeding any further."  5C Charles A. Wright & Arthur Miller, Fed. Prac. & Proc. § 1367 (3d ed. 2019).  When that's the case—as it is here—the standard of review is "functionally equivalent" to that for a Rule 12(b)(6) motion. Rollins v. Wackenhut Servs., Inc., 703 F.3d 122, 130 (D.C. Cir. 2012) (explaining that "the requirements of Iqbal and Twombly . . . apply to a Rule 12(c) motion, which here is functionally equivalent to a Rule 12(b)(6) motion"); see also Nichols v. Young, 248 F. Supp. 3d 1, 6 (D.D.C. 2017) (explaining that the "sole difference" between the two rules is that "a Rule 12(c) motion is the proper vehicle to raise such a challenge after the defendant has answered").  Under that standard, the Court must decide whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"When evaluating a motion for judgment on the pleadings, the [C]ourt may rely on the pleadings, the exhibits to the pleadings, and any judicially noticeable facts to assess whether the movant has met its burden."  Kambala v. Checchi & Co. Consulting, Inc., 280 F. Supp. 3d 131, 137 (D.D.C. 2017); see also Mpoy v. Rhee, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (considering under Rule 12(c) an email "incorporated into the complaint by reference" because, when evaluating "whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of

which we may take judicial notice" (quoting EEOC v. St. Francis Xavier Parochial Sch., 117

F.3d 621, 624 (D.C. Cir. 1997)).  And while the Court construes the factual allegations in the

light most favorable to the non-moving party, it is not bound by that party's legal conclusions.

See Sissel v. U.S. Dep't of Health & Human Servs., 760 F.3d 1, 4 (D.C. Cir. 2014).

## III.  Analysis

DHS first seeks dismissal of Jimenez's claims to the extent they are premised on discrete

events that it contends he failed to exhaust administratively.  The Court will therefore begin with

the agency's exhaustion arguments before moving to consider whether DHS is entitled to

judgment on the pleadings on those claims that Jimenez did exhaust.

A.  Exhaustion[11]

An employee must timely file an administrative claim with his employing agency (here,

DHS) and exhaust all internal remedies before bringing a civil action under Title VII or the

ADEA.  See Coleman v. Duke, 867 F.3d 204, 206 (D.C. Cir. 2017).  DHS argues that Jimenez

failed to exhaust: (1) all claims based on the events alleged in Jimenez's 2012 EEO complaint

---

[11] As an affirmative defense, a failure to exhaust can support a Rule 12(c) motion for judgment on the pleadings when it can be established by the pleadings and any other material reviewable at the pleadings stage.  Here, the Court may consider DHS's exhaustion arguments without converting the motion for judgment on the pleadings into one for summary judgment because its review is limited to the pleadings as well as materials from Jimenez's administrative proceedings.  The latter are "referenced in [Jimenez's] complaint, "central to [his] claims," and subject to judicial notice as "a matter of public record."  See Slate v. Pub. Defender Serv. for the District of Columbia, 31 F. Supp. 3d 277, 287–88 (D.D.C. 2014) (considering, when deciding motion to dismiss, EEO complaint filed by plaintiff and referenced in complaint, letter placing plaintiff on administrative leave with pay, and public arrest record); Dyson v. District of Columbia, 808 F. Supp. 2d 84, 87 n.3 (D.D.C. 2011) (considering, when deciding motion to dismiss, "EEOC and DCOHR documents").  Other courts in this district have likewise considered exhaustion-based arguments when deciding a motion for judgment on the pleadings. See, e.g., Jouanny v. Embassy of France in U.S., 280 F. Supp. 3d 3, 6–7 (D.D.C. 2017).

and (2) the hostile environment claims to the extent they are based on the discrete acts identified as Events 1 through 13 from the 2012 EEO complaint, Events 15 through 17 from the 2015 EEO complaint, and Event 18 from the 2017 EEO complaint.[12]

### 1. 2012 EEO complaint

The Court starts with whether Jimenez exhausted the allegations in his 2012 EEO complaint, which form all or part of the basis for the eight counts in this federal action. It is well-established that when "a complainant forces an agency to dismiss or cancel the complaint by failing to provide sufficient information to enable the agency to investigate the claim, he may not file a judicial suit," and if he does, "the suit will be barred for failure to exhaust administrative remedies." Wilson v. Pena, 79 F.3d 154, 164 (D.C. Cir. 1996). DHS argues that this principle applies here because "the undisputed facts reveal that Plaintiff did not cooperate during the EEOC proceedings related to his 2012 EEO Complaint, which culminated in the EEOC Administrative Judge's ('AJ') dismissal of his case regarding these claims." Mot. at 15. Jimenez completely fails to respond to the government's argument. See Opp. at 13–14. It is clear to the Court, however, that although Jimenez engaged in misconduct during the EEOC hearing process, the agency was ultimately able to investigate and reach the merits of his complaint.

After investigating his formal 2012 EEO complaint, USCIS notified Jimenez in April 2013 of his right to either request a hearing before an EEOC administrative judge or receive a

---

[12] DHS contended in its motion that Jimenez also failed to exhaust Counts III through VIII to the extent they are based on the events alleged in the 2015 and 2017 EEO complaints. See Mot. at 18–20. As noted above, Jimenez has since disavowed any reliance on those events to support Counts III through VIII. See Opp. at 14. Those counts are thus limited to the events alleged in Jimenez's 2012 EEO complaint.

final agency decision.  Jimenez elected the EEOC hearing process.  <u>See</u> Mot. Ex. 17 (Election Form), ECF 31-4, at 27.  The EEOC administrative judge dismissed the complaint from the *hearing process* for discovery-related misconduct (but not from the administrative process entirely).  <u>See</u> Mot. Ex. 23 (2012 AJ Sanction Order), ECF 31-5, at 9 (dismissing complaint "from the Commission hearing process" for his "dilatory tactics" including "repeated *ad hominem* attacks on Agency counsel," "willful disregard for this AJ's order to respond to discovery requiring this AJ to issue an order compelling him to comply," and "feigned illness used to avoid deposition" (citing 29 C.F.R. § 1614.109(f)(3)).  The administrative judge then remanded the complaint to DHS for a final agency decision.  <u>Id.</u>  On remand, DHS's Office for Civil Rights and Civil Liberties ("CRCL") "requested a supplemental investigation" into Jimenez's allegations.  Mot. Ex. 24 (2012 CRCL Final Agency Decision), ECF 31-5, at 13.  After USCIS completed that investigation, CRCL issued its final agency decision denying Jimenez's claims on the merits.  <u>Id.</u> at 16–22.  Finally, Jimenez appealed to the EEOC, which affirmed both the administrative judge's decision to dismiss his hearing request as a sanction for his conduct and CRCL's final agency decision on the merits.  Mot. Ex. 25 (2012 EEOC Decision), ECF 31-5, at 31–33.

As the D.C. Circuit explained in <u>Wilson</u>, "[w]here the agency has taken final action based on an evaluation of the merits, it cannot later contend that the complainant failed to exhaust his remedies."  79 F.3d at 165.  This is because "the policy underlying the [exhaustion] doctrine is not served unless the default prevents the agency from acting on the merits of the complaint."  <u>Id.</u>  Because the agency investigated and then issued a final decision on the merits, the Court concludes that Jimenez—notwithstanding his unacceptable conduct during the EEOC hearing

process—properly exhausted his allegations of discrimination and reprisal based on the allegations advanced in his 2012 EEO complaint.[13]

### 2. *Hostile work environment claims*

DHS also argues that Jimenez failed to exhaust the hostile work environment claims in Counts I, IV, VI, and VIII. <u>See</u> Mot. at 19–20.

#### a. <u>Discriminatory hostile work environment</u>

The Court takes the last three counts first. Counts IV, VI, and VIII advance hostile work environment claims based on race, national origin, and age. Again, these claims are based exclusively on the 2012 EEO complaint.

"[C]ourts do not require a plaintiff to have invoked a hostile work environment claim by name or to use specific 'magic words' in order to exhaust it. But typically the plaintiff must offer at least *some* suggestion of a hostile work environment . . . such as by referring to an ongoing pattern of conduct or describing a workplace pervaded by abuse." <u>Congress v. District of Columbia</u>, 324 F. Supp. 3d 164, 171 (D.D.C. 2017) (Cooper, J.) (citation omitted). Courts therefore look to whether a plaintiff described only discrete events in his administrative charge or also patterns of conduct or other characteristics typical of a hostile work environment claim. <u>See, e.g.</u>, <u>Leach v. Nat'l R.R. Passenger Corp.</u>, 128 F. Supp. 3d 146, 153 (D.D.C. 2015) (Cooper, J.) (noting that plaintiff alleged in EEOC charge that harassment was "ongoing" and that work environment "became hostile").

---

[13] Successful exhaustion, of course, says nothing of the merits. The Court addresses below whether DHS is entitled to judgment on the pleadings with respect to any claims based on Events 1 and 2. DHS opted not to brief the merits of Jimenez's claims based on the non-selections identified in Events 3 through 13, citing the significant expenditure of resources that would have been required to challenge these claims. <u>See</u> Mot. at 26 n.9. Accordingly, claims based on those non-selections will be permitted to proceed to discovery.

Jimenez's 2012 EEO complaint makes no mention of a hostile work environment. In addition, neither his charge nor the agency's letter reflecting the allegations accepted for investigation alludes to an ongoing pattern of conduct or a workplace pervaded by abuse. See Congress, 324 F. Supp. 3d at 171. The charge's description of discrete events could not, therefore, be "reasonably expected upon investigation to lead to a hostile work environment claim." Park v. Howard Univ., 71 F.3d 904, 908 (D.C. Cir. 1995). This conclusion is reflected in CRCL's final agency decision, which addresses in full Jimenez's allegations of *discrete* acts of discrimination but in no way references ongoing harassment or a hostile work environment. See 2012 CRCL Final Agency Decision at 16–22. The Court therefore finds that Jimenez did not exhaust any hostile work environment claims in his 2012 EEO complaint and will accordingly grant judgment to DHS on Counts IV, VI, and VIII.

b. Retaliatory hostile work environment

That leaves Count I, Jimenez's claim for "hostile work environment based on prior EEO activity." Am. Compl. ¶¶ 102–05. DHS argues that Jimenez failed to exhaust this "retaliatory hostile work environment claim" based on the events identified in his 2012 EEO complaint, three of the four events identified in his 2015 EEO complaint, and one of the events identified in his 2017 EEO complaint. See Mot. at 19.

As an initial matter, Jimenez's federal complaint appears to limit Count I to the events alleged in the 2015 and 2017 EEO complaints, not those alleged in the 2012 one. See Am. Compl. ¶¶ 6, 58, 96–101. Moreover, Jimenez asserts in his opposition brief that his "2015 EEO Complaint and 2017 EEO Complaint, referenced as Events 14–20"—without any reference to the 2012 EEO complaint or Events 1 through 13—"allege reprisal and retaliatory hostile work environment." Opp. at 14. Finally, as explained above, far from using the words "hostile work

environment," the 2012 EEO complaint does not even "offer at least *some* suggestion of a hostile work environment in the charge narrative." See Congress, 324 F. Supp. 3d at 171. The Court will therefore address whether Jimenez exhausted his retaliatory hostile work environment claim based just on the 2015 and 2017 EEO complaints.

DHS does not dispute that Jimenez exhausted two retaliatory hostile environment claims, one in his 2015 EEO complaint and one in his 2017 complaint. The question is whether Jimenez can also rely on the other allegations advanced in those complaints to support his overall retaliatory hostile environment claim. The Court concludes that he can.

In the 2015 complaint, Jimenez alleged that he was subjected to a hostile work environment between February 27, 2015 and April 14, 2015, "which was manifested through management accusing him of failing to turn in his telework agreement, failing to turn in an assignment, and missing an appointment." Mot. Ex. 44 (2015 Agency Acceptance Letter), ECF 31-7, at 10. In addition to this allegation (Event 14), Jimenez separately alleged in Events 15 through 17 that his two-year detail with INTERPOL was terminated early, in June 2015, based on a false report by his supervisor; that he was denied the opportunity to attend a training session in July 2015; and that he was denied access to the HSDN system in August 2015. Id. DHS argues that Jimenez cannot rely on Events 15, 16, and 17 in support of his hostile environment claim because he exhausted those events exclusively as discrete retaliatory acts. Mot. at 19; Reply, ECF 30, at 15–16.

The government makes a similar point with respect to the events alleged in the 2017 EEO complaint. See id. DHS acknowledges that Jimenez alleged that he was subjected to a retaliatory hostile work environment between April 20, 2017 and July 19, 2017 "when management unfairly scrutinized [his] work, denied [his] cube transfer request, and suddenly

changed [his] performance expectations." 2017 Agency Acceptance Letter at 58. The government contends that Jimenez cannot now rely on Event 18, the other allegation in that complaint—that he was suspended without pay for three calendar days in March 2017 in retaliation for prior EEO activity—as part of a hostile work environment claim. See Mot. at 19; Reply at 15.

The government is mistaken. Jimenez's "hostile work environment claim is [] not doomed by the fact that [he] earlier asserted some of the allegations as discrete [] claims." Gilliard v. Gruenberg, 302 F. Supp. 3d 257, 280 (D.D.C. 2018). This is because "although a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard, neither can a court dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own." Baird v. Gotbaum ("Baird I"), 662 F.3d 1246, 1252 (D.C. Cir. 2011). Because "'the exhaustion requirement on a hostile work environment claim is less stringent' than for stand-alone claims of discrimination and retaliation, [] a plaintiff 'need only have filed an [administrative] complaint alleging some of the claims that comprise the hostile work environment claim.'" Leach, 128 F. Supp. 3d at 153 (quoting Nurriddin v. Goldin ("Nurridin I"), 382 F. Supp. 2d 79, 106 n.10 (D.D.C. 2005)). Thus, a plaintiff "may incorporate non-exhausted allegations into a hostile work environment claim so long as some allegations were exhausted and all of the allegations together form one hostile environment claim." Hyson v. Architect of Capitol, 802 F. Supp. 2d 84, 96 (D.D.C. 2011) (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115–17 (2002); Nurriddin I, 382 F. Supp. 2d at 106 n.10). To form one claim, the unexhausted allegations must be "adequately linked" to the exhausted ones—"if, for example, they 'involve[] the same type of employment

actions, occur[] relatively frequently, and [are] perpetuated by the same managers." Baird I, 662

F.3d at 1251 (alterations in original) (quoting Morgan, 536 U.S. at 120–21).

Events 15, 16, and 17 are "adequately linked" to Event 14.  Those events all involve

alleged harassment "perpetrated by the same manager[]," id.: it was Golston who allegedly

falsely accused Jimenez of not performing work, failing to turn in his telework agreement, and

missing a meeting; Golston who allegedly falsely reported to INTERPOL that Jimenez had sent

sensitive information to his personal email, leading to his early termination; Golston who

allegedly denied Jimenez's request to attend a training session; and Golston who allegedly

misinformed Jimenez that he no longer needed access to his HSDN account.

Moreover, CRCL's final agency decision on the 2015 complaint described the issue

presented as "whether USCIS discriminated against Complainant and subjected him to a hostile

work environment based on reprisal" before listing all of the separate allegations rather than just

the distinct period of harassment alleged in Event 14.  Mot. Ex. 49 (2015 CRCL Final Order),

ECF 31-7, at 51.  That the agency treated Jimenez's hostile environment claim as based on all of

the allegations suggests the Court should do the same.  If "[t]he primary purpose of the

exhaustion requirement is to provide the agency with sufficient notice to begin the investigative

process," Hernández v. Mao, 235 F. Supp. 3d 172, 177 (D.D.C. 2017) (citing Brown v. Marsh,

777 F.2d 8, 13 (D.C. Cir. 1985); Park, 71 F.3d at 907), it would be strange indeed to say that

Jimenez did not exhaust when the agency at one point framed his 2015 administrative complaint

as a single hostile environment claim.

Event 18—the three-day-suspension—is also "adequately linked" to form a "coherent

hostile environment claim" because it allegedly stems from the previous allegations of

harassment.  In his affidavit in support of his 2017 EEO complaint, Jimenez averred that the

suspension "was initiated by a contrived and false report by USCIS officials to INTERPOL that I had engaged in conduct including sending Red Notices to my personal email account."  Mot. Ex. 71 (2017 Jimenez Aff.), ECF 31-10, at 3.  Remember that Jimenez alleged in his 2015 EEO complaint that (Event 15) Golston falsely accused him of sending sensitive information to his personal email addresses.  In the affidavit, Jimenez also connects his suspension to Event 14: "[t]hey did this"—impose the three-day suspension—"like they did in regard to the claims that I was not submitting required reports . . . to create a foundation by which they could find fault with my work, lower my rating, and continue in their efforts to either get me to resign or to place me in such an untenable situation that I would either make a serious mistake [or] fail in something in a way that would allow them to seek to fire me."  Id. at 5.  Because Jimenez expressly linked his three-day suspension to previous allegations of harassment, the agency had "notice that it should investigate the multitude of alleged agency actions as part of an alleged hostile work environment claim."  Mot. at 20.  The Court will therefore deny DHS's motion for judgment on the pleadings for failure to exhaust the retaliatory hostile environment claim. Nevertheless, as explained next, that he can rely on these allegations does not mean that Jimenez has plausibly stated a retaliatory hostile environment claim.

B. Retaliatory Hostile Work Environment

The Court now moves to the government's contention that Jimenez has failed to state valid claims pursuant to Rule 12(c).  It begins with Jimenez's retaliatory hostile work environment claim in Count I.

To prevail on a hostile environment claim based on previous participation in protected activity, a plaintiff must show that he "was subjected to retaliatory intimidation that was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an

abusive working environment.'" Román v. Castro, 149 F. Supp. 3d 157, 166 (D.D.C. 2016)

(Cooper, J.) (quoting Baird I, 662 F.3d at 1250). "Severity and pervasiveness are determined by

reference to 'all the circumstances,' including 'the frequency of the [retaliatory] conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." Baird v. Gotbaum

("Baird II"), 792 F.3d 166, 169 (D.C. Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S.

17, 23 (1993)). "The more severe the harassment, the less pervasive it needs to be, and vice

versa." Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 599 (D.C. Cir. 2013) (internal quotation

marks, citation omitted). Ultimately, though, "conduct must be extreme" to "ensure that Title

VII does not become a general civility code" requiring courts to police "the ordinary tribulations

of the workplace." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation

marks, citations omitted).

Rather than pointing to retaliatory "intimidation, ridicule, and insult," Harris, 510 U.S. at

21 (citation omitted), Jimenez mostly lists a series of ordinary "work-related actions by

supervisors," which "courts typically do not find . . . to be sufficient for a hostile work

environment claim," Munro v. LaHood, 839 F. Supp. 2d 354, 366 (D.D.C. 2012); see also Swann

v. Office of Architect of Capitol ("Swann I"), 73 F. Supp. 3d 20, 32 (D.D.C. 2014) (Cooper, J.)

(explaining that "[c]ourts in this district consistently have found that these sorts of employment-

related actions"—referring to "work-related" actions such as a denial of overtime, termination of

grace period for late arrival, and application of a civilian clothes decorating policy—"are not

sufficiently severe or offensive to support a hostile work environment claim" (citing Wade v.

District of Columbia, 780 F. Supp. 2d 1, 19 (D.D.C. 2011)), aff'd No. 15-5001, 2015 WL

5210251 (D.C. Cir. Aug. 18, 2015) (per curiam).[14]  For instance, he says that his supervisors in 2015 falsely accused him of failing to submit weekly reports, lying about speaking with IT about a computer problem, and breaking the agency's email policy.  Am. Compl. ¶¶ 36–57.  But these kinds of "criticisms of [] work and other negative comments do not sufficiently demonstrate a significant level of offensiveness."  Nurridin, 674 F. Supp. 2d at 94; see also Holmes-Martin v. Sebelius, 693 F. Supp. 2d 141, 165 (D.D.C. 2010) (dismissing hostile work environment claim based in part on allegations of "public criticism of [] job performance").  The same goes for Jimenez's allegations that his supervisors in 2017 closely monitored his work activities and imposed deadlines that were impossible to meet because of that scrutiny, leading to a lowered performance evaluation.  Am. Compl. ¶¶ 96–99.  The court in Nurridin explained that neither "lowered performance evaluations" nor "close scrutiny of assignments by management" generally can "be characterized as sufficiently intimidating or offensive in an ordinary workplace context."  Nurridin, 674 F. Supp. 2d at 94; see also Graham v. Holder, 657 F. Supp. 2d 210, 217 (D.D.C. 2009) ("Being subjected to 'scrupulous monitoring' does not support a claim for hostile work environment." (quoting Runkle v. Gonzales, 391 F. Supp. 2d 210, 226 (D.D.C. 2005)).

Jimenez's remaining allegations do not transform these ordinary workplace travails into an objectively hostile environment.  For example, he alleges that he was denied the opportunity to attend a training session that others were permitted to attend, Am. Compl. ¶¶ 79–81, and that he was the only employee in his branch denied access to the High Security Data Network, which

---

[14] In briefing, DHS only addressed whether Events 14, 19, and 20 could constitute a retaliatory hostile work environment as a matter of law.  See Mot. at 50–58; Reply at 20–25. Because the Court concludes that Jimenez may also rely on Events 15, 16, 17, and 18, the Court will consider whether all of those events as alleged together plausibly state a retaliatory hostile work environment claim.

is necessary for him to complete assignments, id. ¶¶ 82–89. These allegations are insufficiently severe to support a hostile work environment claim. Accord Beckwith v. Ware, 174 F. Supp. 3d 1, 3, 5 (D.D.C. 2014) (explaining that denial of certain training and access to agency's computer system—in addition to other workplace issues like denial of award and opportunity to telecommute—came "nowhere near satisfying the [] standard" for hostile work environment (citing Nurriddin v. Bolden ("Nurridin II"), 674 F. Supp. 2d 64, 94 (D.D.C. 2009))), aff'd No. 15-5102, 2015 WL 9005393 (D.C. Cir. Nov. 6, 2015) (per curiam).

And finally, Jimenez alleges that he was suspended for three days based on the false accusation that during his INTERPOL detail, he improperly sent sensitive information to his personal email account. See Am. Compl. ¶¶ 90–91. However, as another court in this district explained in Aldrich v. Burwell, 197 F. Supp. 3d 124 (D.D.C. 2016), "the fact that the group [of allegations] includes one of the alleged discrete acts of discrimination—*i.e.*, the [] suspension— does not perforce establish a hostile environment." Id. at 138. Rather, the plaintiff in that case needed but was unable to point to something "more" to make the conduct severe. Id. (quoting Nurriddin II, 674 F. Supp. 2d at 94). Jimenez does not offer that "more" either: even when combined with a three-day suspension, Jimenez's various performance-based allegations are not intimidating or offensive enough to be considered severe harassment.

Jimenez's main response is to focus on the *pervasiveness* of the alleged harassment, saying it was "regular" and "continuing" between 2012 and 2017. Opp. at 20. In support of this argument, he references his "other EEO complaints that were ongoing" between the 2012 EEO complaint and the 2015 complaint. Id. But as explained above, Jimenez did not exhaust a retaliatory hostile work environment claim in his 2012 EEO complaint. Moreover, he did not include in his federal complaint any allegations regarding these "other EEO complaints." They

are therefore not part of the constellation of incidents the Court considers when determining whether Jimenez has adequately stated a retaliatory hostile work environment claim.

It is true that less severe events, by virtue of their pervasiveness, might sometimes create a hostile work environment. See Ayissi-Etoh, 712 F.3d at 599. Here, Jimenez has identified seven incidents—most of which represent ordinary workplace tribulations—spread over the course of two and a half years. Similar distributions of incidents have been described as "temporarily diffuse" and "suggesting a lack of pervasiveness." Nurridin, 674 F. Supp. 2d at 94 (concluding that series of fourteen alleged events over course of four years "did not sufficiently demonstrate a significant level of offensiveness" or "pervasiveness"); see also Aldrich, 197 F. Supp. 3d at 139 ("That the three-and-a-half-year period comprising this allegedly hostile environment was dotted with [ten] loosely related workplace grievances does not reveal a 'pervasive' pattern of abuse.").

Altogether, Jimenez alleges that he was unfairly criticized and closely scrutinized; falsely accused of misconduct; and denied access to trainings and a sensitive data system over the course of two and a half years. As in Nurridin and Aldrich, Jimenez's allegations of generally normal workplace strife do "not reveal a 'pervasive' pattern of abuse." Aldrich, 197 F. Supp. 3d at 139. The Court therefore will grant judgment on the pleadings to the government on Count I.

C.  Discrete Acts of Discrimination and Retaliation

Title VII, as relevant here, forbids employment discrimination based on an employee's race or national origin, and the ADEA prohibits employment discrimination based on the employee's age. Under both statutes, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." Baloch v. Kempthorne, 550 F.3d 1191,

20

1196 (D.C. Cir. 2008) (citing 42 U.S.C. § 2000e-16a (Title VII); 29 U.S.C. § 621 (ADEA)). The two essential elements for a retaliation claim under both statutes are that (i) the plaintiff suffered "a materially adverse action" (ii) because he engaged in activity protected by the relevant statute. Id. at 1198.

What constitutes an adverse action in the discrimination context is different than what constitutes an adverse action in the retaliation context. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). A discriminatory adverse action is one that "affect[s] the terms, conditions, or privileges of employment or future employment such that a reasonable trier of fact could find objectively tangible harm." Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002). A retaliatory adverse action, meanwhile, "encompass[es] a broader sweep of actions than those in a pure discrimination claim" and "may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'" Baloch, 550 F.3d at 1198 n.4 (quoting Burlington N., 548 U.S. at 64, 68). The test, in this context, is whether the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 68 (internal quotation marks, citation omitted). But even with its broader reach, a retaliatory adverse action is still "limited to [cases in which] an employer causes 'material adversity,' not 'trivial harms.'" Wiley v. Glassman, 511 F.3d 151, 161 (D.C. Cir. 2007) (emphasis in original) (quoting Burlington N., 548 U.S. at 68).

These standards in mind, the Court will address Jimenez's remaining claims of disparate treatment. DHS argues, among other things, that Jimenez has not alleged adverse actions for his claims based on Events 1, 2, 15, 16, and 17, and that he has not alleged retaliatory motive for Event 18. Jimenez does not directly confront these arguments. Instead, he merely cites cases in

which courts have recognized adverse actions, without applying the reasoning in those cases to the allegations in his. See Opp. at 24–25. In any case, the Court discusses each relevant event below.

### 1. Event 1: May 2012 email counseling

Jimenez alleges that in May 2012, he sent an email to a group of individuals including his supervisors referencing his prior EEO activity. Am. Compl. ¶ 21. His then first-line supervisor then sent him an email that served as "written counseling for inappropriate use of a government email system," describing Jimenez's email as "disruptive and [] not serv[ing] a legitimate business purpose." Id. ¶¶ 22–23. Jimenez claims that this counseling was "improperly based on [his] reference to his prior EEO activity." Id. ¶ 23.

Jimenez has not plausibly alleged an adverse action based on this email. Under the higher standard for discrimination claims, "formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions." Stewart v. Evans, 275 F.3d 1126, 1136 (D.C. Cir. 2002); see also, e.g., Herbert v. Architect of Capitol, 766 F. Supp. 2d 59, 75 (D.D.C. 2011) (finding that "relatively bland and innocuous" letter of reprimand did not constitute materially adverse action where it did not affect working conditions and was not used as basis for more severe disciplinary action). And even under the lower threshold for retaliation claims, a letter of counseling or written reprimand will rarely constitute a materially adverse action even when tangentially related to an EEO complaint. See Toomer v. Mattis, 266 F. Supp. 3d 184, 201 (D.D.C. 2017). Here, the email counseling was less severe than a formal letter of reprimand and does not contain any abusive language. And Jimenez does not allege that the counseling was a predicate for any

additional disciplinary action or tangible harm.  The Court will therefore dismiss Counts II, III, V, and VII to the extent they are based on Event 1.

### 2. *Events 2 and 16: Denial of training opportunities*

Next, Jimenez alleges that he was not selected to attend a "Train the Trainer" course in 2012 (Event 2), Am. Compl. ¶ 24, and a four-hour social media training in 2015 (Event 16), id. ¶¶ 79–80.  He relies on Event 2 in support of his discrimination and retaliation claims and Event 16 in support of his retaliation claim.

Jimenez has not plausibly alleged adverse actions based on these denied training opportunities.  The Court agrees with a fellow district court's conclusion that the "denial of training opportunities is only actionable if there is a resultant 'material change in . . . employment conditions, status, or benefits' that results 'in tangible harm.'"  Morales v. Gotbaum, 42 F. Supp. 3d 175, 202 (D.D.C. 2014) (alterations in original) (quoting Dorns v. Geithner, 692 F. Supp. 2d 119, 133 (D.D.C. 2010)); see also, e.g., Walker v. Mattis, 319 F. Supp. 3d 267, 276 (D.D.C. 2018).  Jimenez makes no attempt to allege that he suffered a tangible harm from not participating in the training course identified in Event 2.  And although the standard for retaliation claims is lower, the allegedly adverse action must still cause "*material* adversity" rather than "trivial harms."  Wiley, 511 F.3d at 161 (emphasis in original) (quoting Burlington N., 548 U.S. at 68); see also Burlington N., 548 U.S. at 67 ("The antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").  Jimenez has failed to allege any material adversity—such as a hampered ability to perform his job or the loss of future advancement opportunities—stemming from the denial of his training requests in 2012 and 2015.  See Jones v. Wash. Metro. Area Transit Auth., No. 08-cv-2193 (RLW), 2011 WL 4536968, at *5 (D.D.C. Oct. 2, 2011) (granting summary

judgment under "lesser" burden for retaliatory adverse action where "the challenged action—denial of a single training class—did not even diminish Plaintiff's job responsibilities, and . . . while it caused her some inconvenience, it did not hamper her overall ability to perform her job"). Accordingly, the Court will dismiss Jimenez's discrimination claims in Counts III, V, and VII to the extent they are based on Event 2 and the reprisal claim in Count II to the extent it is based on Events 2 and 16.

### 3. Event 17: Denial of access to HSDN

The Homeland Security Data Network ("HSDN") is a DHS computer system that houses sensitive but unclassified information. Jimenez alleges that he requires access to the HSDN to fulfill his job duties. Am. Compl. ¶ 82. In August 2015, he asked that his HSDN account be reactivated after it was suspended during his INTERPOL detail (which is the subject of Event 15 and discussed in more detail below). Id. ¶¶ 83–84. He alleges that he was denied access "for the stated reason that he did not have TC/SCI clearance." Id. ¶ 85. Jimenez avers that without access to the system, he has been forced to rely on coworkers for information in order to complete assignments. Id. ¶ 88.

The government relies on Wilkerson v. Gruenberg, 318 F. Supp. 3d 101 (D.D.C. 2018), for the proposition that denial of access to shared workplace electronic resources is not a materially adverse action. See Mot. at 42–43 (quoting Wilkerson, 318 F. Supp. 3d at 107). Wilkerson does not stand for that proposition, however. Rather, in that case, "[t]he record [] shows that [the plaintiff] *was* granted access to the electronic resources that she complains she did not receive as quickly as [a male co-worker]." 318 F. Supp. 3d at 106 (emphasis added). The court concluded that this mere "delayed access" was not sufficient to establish an adverse action. Id. It's true that "minor 'inconveniences'" like delayed computer access or similar

workplace impediments generally do not constitute adverse actions.  See Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting Stewart, 275 F.3d at 1135).  But here, Jimenez has alleged that he has not had access to the HSDN *since 2015*.  Accepting his allegation that he needs access to the database to perform his job, four years of being denied it strikes the Court as going beyond mere inconvenience and rising to an adverse action for purposes of a retaliation claim.

To state a *prima facie* case of retaliation, Jimenez must also allege a causal connection between his protected activity and the materially adverse action.  See Baloch, 550 F.3d at 1198. Jimenez alleges that he was cut off from the HSDN because he didn't have the proper security clearance (even though clearance wasn't required) and that he was "the only employee in the Case Resolution Branch who does not have access to the HSDN system."  Am. Compl. ¶¶ 85, 89.  Taking those allegations as true, which the Court must at this stage, Jimenez has raised a plausible inference that he was singled out for his prior EEO activity—which also allegedly caused his early return from the INTERPOL detail and thus his need for HSDN access to be reinstated at all.  He has thus stated a *prima facie* claim of retaliation based on his lack of access to the HSDN system.  The Court therefore will deny DHS's motion for judgment on the pleadings on Jimenez's reprisal claim in Count II to the extent it is based on Event 17.

DHS's other response is to provide a legitimate, non-retaliatory reason for denying Jimenez access to the system: he doesn't need it.  See Mot. at 43.  And DHS has offered some evidence to that effect—namely, emails from Golston and O'Brien denying Jimenez's request for HSDN access because his "current assignment does not require access to the HSDN" (not because he lacked clearance, as Jimenez alleges).  Mot. Ex. 67 (M. O'Brien email to R. Jimenez, Aug. 5, 2015 at 4:33 PM), ECF 31-9, at 42–43.  But this is a question for summary judgment.

While it may prove that Jimenez doesn't need the information to do his job, the Court cannot resolve this factual dispute based on the record before it. The Court notes as well that to prevail on this claim, Jimenez will need to produce "sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason" for the adverse employment actions "and that the employer intentionally [retaliated] against" him. Evans v. Sebelius, 716 F.3d 617, 620 (D.C. Cir. 2013) (citation omitted).

####### 4. Event 15 and 18: Termination of INTERPOL detail and subsequent three-day suspension

More context is needed for the Court's discussion of Events 15 and 18, both of which relate to an email exchange in April 2015 between Jimenez and his first-line supervisor, Golston.

In September 2014, Jimenez began a temporary, two-year detail to INTERPOL in Washington, DC. See Am. Compl. ¶ 62. While there, he was required to submit periodic work reports to Golston. See id. ¶ 41; Mot. Ex. 54 (Email chain), ECF 31-8, S. Golston email (Mar. 30, 2015 at 2:54 PM) at 38.[15] He emailed one of those reports (in the form of an Excel spreadsheet) to her on April 10, 2014. See Am. Comp. ¶ 42; Email chain: R. Jimenez email to S. Golston (Apr. 10, 2015 at 7:41 PM) at 50. Despite apparently having received it, Golston emailed Jimenez with a request four days later to resend that report. See Am. Compl. ¶ 43; Email chain: S. Golston email to R. Jimenez (Apr. 14, 2015 at 9:12 AM) at 49. He responded that he had already submitted it. See Email chain: R. Jimenez email to S. Golston (Apr. 14, 2015 at 9:26 AM) at 48–49. Jimenez then emailed Golston the spreadsheet again. See Am. Compl. ¶ 44; Email chain: R. Jimenez email to S. Golston (Apr. 14, 2015 at 9:59 AM) at 47.

---

[15] The Court may consider these emails at this stage in the litigation because they are incorporated by reference in Jimenez's complaint. See Mpoy, 758 F.3d at 291 n.1.

This did not end the confusion. That evening, Jimenez sent Golston a long email that again included the spreadsheet. See Am. Compl. ¶ 47; Email chain: R. Jimenez email to S. Golston (Apr. 14, 2015 at 6:04 PM) at 45–46. And finally, in response to an email from Golston suggesting that Jimenez had not submitted the report on time, see Email chain: S. Golston e-mail to R. Jimenez email (Apr. 15, 2015 at 11:50 AM), at 43–44, Jimenez emailed Golston screenshots of his previous emails sending the work report, see Email chain: R. Jimenez email to S. Golston (Apr. 15, 2015 at 5:43 PM) at 40–43; Mot. Ex. 56 (Screenshot of Jimenez emails sent Apr. 14, 2015 at 9:59 AM & 6:04 PM), ECF 31-8, at 54–55. Those screenshots show that Jimenez blind copied two of his personal email addresses when emailing the report to Golston.

In the midst of this exchange, Jimenez filed an EEO complaint alleging that his supervisors had harassed him by falsely accusing him of not submitting the work report. See Am. Compl. ¶ 58. According to Jimenez, when Golston learned of this complaint in June 2015, she "contacted INTERPOL Information Systems Security Officer Nathree Turner and falsely claimed that Plaintiff had sent sensitive information to his personal email accounts on April 14, 2015." Id. ¶¶ 65–66. Golston allegedly sent the screenshots to the INTERPOL officer. Id. ¶¶ 68–70. Jimenez says that, relying on the screenshots and Golston's false accusation, Turner reviewed what he believed to be the attachment Jimenez had emailed and determined that there were Red Notices in the document. Id. ¶ 71. Because INTERPOL employees are prohibited from sending Red Notices to their personal email addresses, Jimenez's detail was immediately terminated sixteen months early. Id. ¶ 72.

The Court concludes that DHS is entitled to judgment as a matter of law on Jimenez's retaliation claim based on his early termination from the INTERPOL detail. To state a retaliation claim, Jimenez must allege that he engaged in a statutorily protected activity, that he suffered a

materially adverse action, and that a causal link connects the two.  See Baloch, 550 F.3d at 1198.

Jimenez has alleged the first two: he engaged in a statutorily protected activity by filing an

administrative complaint arising out of the work-report confusion and he suffered an adverse

action when his INTERPOL detail was terminated early.[16]  The question is whether Jimenez has

alleged a causal connection between the two.

The government contends the causal link is missing because it was INTERPOL, not

DHS, that terminated Jimenez's detail.  See Mot. at 39–40.  Jimenez's complaint circumvents

this inconvenient fact, alleging that Golston, motivated by retaliatory animus, "provided untrue

and misleading information to INTERPOL *causing* Plaintiff's detail to end 16 months early."

Am. Compl. ¶ 77 (emphasis added).  This allegation has the ring of a "cat's paw" theory of

liability.[17]  Under that theory, the retaliatory "animus of the employee who set the events in

motion, but was not the ultimate decision maker, could be found to be a 'motivating factor' in an

adverse employment decision."  Duncan v. Johnson, 213 F. Supp. 3d 161, 193 (D.D.C. 2016)

(citing Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011)).  The Supreme Court has held that a

plaintiff can prevail under a cat's paw theory "if [1] a supervisor performs an act motivated by

[retaliatory] animus, [2] that is intended by the supervisor to cause an adverse employment

action, and . . . [3] that act is a proximate cause of the ultimate employment action."  Burley v.

---

[16] The government's contention that an early termination from a detail is not an adverse action belies common sense and the law.  The government relies on inapposite cases which stand for the proposition that in general, the denial of placement in a temporary detail does not constitute an adverse action because any prospective harm is "too speculative."  Mot. at 38–39 (quoting, for example, Maramark v. Spellings, No. 06-5099, 2007 WL 2935411, at *1 (D.C. Cir. Sept. 20, 2007) (per curiam)).  No speculation is needed here where the plaintiff was removed from a detail that was supposed to last more than a year longer.

[17] The Court notes that Jimenez has not raised this theory of causation or addressed the government's arguments regarding this specific event.

Nat'l Passenger Rail Corp., 801 F.3d 290, 297 (D.C. Cir. 2015) (second alternation added) (quoting Staub, 562 U.S. at 422).

Jimenez's own allegations, however, render a cat's paw theory implausible because of the third, proximate cause requirement. Although "proximate cause requires 'only some direct relation between the injury asserted and the injurious conduct alleged," the Supreme Court in Staub explained that "if 'an employer's investigation results in an adverse action for reasons unrelated to [a] supervisor's original biased action . . . , then the employer will not be liable.'" Swann v. Office of the Architect of the Capitol ("Swann II"), 185 F. Supp. 3d 136, 144 (D.D.C. 2016) (Cooper, J.) (alteration in original) (quoting Staub, 562 U.S. at 419, 421), aff'd No. 16-5201, 2017 WL 160810 (D.C. Cir. Jan. 3, 2017). For example, in Swann II, this Court explained that although there was "no dispute that the [allegedly retaliatory] letter [from a supervisor] spurred the OIG to investigate," the plaintiff failed to offer evidence at summary judgment "even suggest[ing] that the letter or its contents influenced the outcome of OIG's investigation" that led to the adverse action. Id. So too here. Although Golston's alleged report of misconduct may have spurred INTERPOL to investigate, Jimenez has alleged that after receiving the report, an INTERPOL official "then reviewed a copy of what he believed to be the attachment Plaintiff had sent to his personal email and discovered that there were four Red Notices in the document." Am. Comp. ¶ 71. In other words, the INTERPOL official "did not simply rubberstamp the recommendation that had been submitted to him." Duncan, 213 F. Supp. 3d at 194. Instead, he conducted an independent investigation and determined that it was possible that Jimenez had violated INTEROL's security protocols. Even construing Jimenez's allegations liberally, this alleged independent review of the evidence breaks the causal chain between Golston's retaliatory animus and the ultimate adverse action of early termination of the detail.

As it turns out, the INTERPOL official was mistaken, and Jimenez had not emailed Red Notices to his personal accounts.[18]  Am. Compl. ¶ 73; Report of Investigation at 4.[19]  As Event 18, Jimenez alleges that he was suspended without pay for three days in March 2017 "due to the false report that Plaintiff sent 'Red Notices' to his personal email account while he was detailed at INTERPOL."  Am. Compl. ¶ 90.  He claims that this suspension is "directly attributable" to his supervisors' earlier retaliation for his reporting their email harassment.  Id. ¶ 91.

Although a three-day suspension constitutes an adverse employment action, Jimenez's alleged theory of causation—that he was suspended "due to the false report that [he] sent 'Red Notices' to his personal email account"—is directly contradicted by evidence subject to judicial notice and incorporated by reference into the complaint.  See Kaempe v. Myers, 367 F.3d 958, 963 (D.C. Cir. 2004) (explaining that a court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint[,] matters subject to judicial notice," and other materials a court may consider when determining whether complaint plausibly states a claim).

_____

[18] This mistake does not change the Court's analysis with respect to Event 15.  The question is whether the INTERPOL officer "honestly and reasonably believed" in good faith that Jimenez had violated INTERPOL's internal information security policies, not whether he was actually correct.  See Brady v. Office of Sergeant at Arms, 520 F.3d 490, 496 (D.C. Cir. 2008).  Jimenez has not alleged that the INTERPOL officer himself was also motivated by retaliatory animus or that he made anything other than an honest mistake by reviewing the wrong document when evaluating whether Jimenez had sent sensitive information.

[19] The Court may rely on the USCIS Office of Security and Integrity's Report of Investigation, Notice of Proposed Suspension, and Notice of Suspension as incorporated by reference in Jimenez's amended complaint and subject to judicial notice as part of the administrative record in this case.  See Kambala, 280 F. Supp. 3d at 137; Mpoy, 758 F.3d at 291 n.1.

The USCIS Office of Security and Integrity ("OSI") initiated an investigation into whether Jimenez violated USCIS rules of behavior by emailing sensitive information included in his work report to his personal email.  See Report of Investigation at 3.  Relying on the investigation's report, a supervisory immigration officer issued Jimenez a Notice of Proposed Three Day Suspension.  See Mot. Ex. 78 (Notice of Proposed Suspension) (Oct. 3, 2016), ECF 31-10, at 81–85.  According to the Notice, the OSI investigation revealed that while Jimenez had not sent Red Notices, he *had* sent four alien registration numbers to his personal emails.  Id. at 82.  The Notice further explained that alien registration numbers are considered "sensitive personally identifiable information" ("SPII"), and that the USCIS Rules of Behavior prohibit employees from sending SPII to personal emails.  Id.

Represented by private counsel, Jimenez filed an 18-page response to the Notice.  See Mot. Ex. 79 (Oct. 25, 2016 Jimenez Resp.), ECF 31-10.  In his response, Jimenez acknowledged blind copying his personal email addresses on the email attaching the Excel spreadsheet.  Id. at 103–04.  He argued, however, that his behavior was not misconduct because his "only purpose in sending the noted information to his personal email" was to preserve evidence that he had in fact submitted work reports and protect himself against future harassment.  Id. at 104.  The Chief of Staff for the Fraud Detection National Security division of USCIS considered Jimenez's response but still "concluded that preponderant evidence demonstrates that [he] committed the misconduct as charged"—namely, that he "purposefully emailed a spreadsheet containing four alien registration numbers to two personal email accounts" and that "alien registration numbers are regarded as stand-alone SPII."  Mot. Ex. 80 (Mar. 2, 2017 Notice of Disciplinary Action), ECF 31-10, at 108–09.

Thus, contrary to Jimenez's allegation, he was suspended because he sent four alien registration numbers to his personal email accounts in violation of the USCIS Rules of Behavior, not because he sent Red Notices.  Accordingly, as with Event 15, Jimenez's has not plausibly alleged causation even under a cat's paw theory because the causal chain between any retaliatory animus on Golston's part and the ultimate suspension was broken by OSI's independent investigation into the allegation of misconduct.  See Duncan, 213 F. Supp. 3d at 193–95 (granting summary judgment to employer where decisionmaker based suspension on agency labor relation office's independent investigation and plaintiff's written submissions in addition to allegedly biased supervisor's memorandum).

For the reasons stated, the Court will therefore dismiss Count II to the extent it is based on Events 15 and 18.

## IV.  Conclusion

For the foregoing reasons, the Court will grant in part Defendant's Motion for Judgment on the Pleadings.  A separate Order shall accompany this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  August 20, 2019