UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**ROLANDO JIMENEZ**,

      Plaintiff,

    v.

**ALEJANDRO MAYORKAS**,

      Defendant.

Case No. 17-cv-2731 (CRC)

## MEMORANDUM OPINION

Plaintiff Rolando Jimenez is currently employed as an Immigration Officer in the Immigrant Investor Program Office within the Department of Homeland Security ("DHS"). PSOMF ¶ 2. Jimenez alleges that his superiors at the agency discriminated against him on the basis of his race, age, and national origin, and retaliated against him for filing EEO complaints.

The Court previously dismissed many of Mr. Jimenez's claims for either failure to exhaust administrative remedies or failure to state a claim. Jimenez v. McAleenan, 395 F. Supp. 3d 22 (D.D.C. 2019) (Jimenez I). The Court also granted summary judgment to DHS on Jimenez's claims that the agency passed him over for numerous positions for discriminatory or retaliatory reasons. Jimenez v. Wolf, No. 17-CV-2731 (CRC), 2020 WL 12895803 (D.D.C. Sept. 24, 2020) (Jimenez II). This left one claim standing: that in 2015, Jimenez's supervisors denied his request to access to the Homeland Security Data Network ("HSDN")—an agency information system used to share sensitive information—in retaliation for his earlier EEO complaints. Am. Compl. ¶¶ 82–89.

The parties have engaged in discovery related to this final claim. The government now moves for summary judgment. Finding no genuine dispute of material fact, the Court will grant the motion.

I. **Background**

Rolando Jimenez began working for the predecessor agency of the U.S. Citizenship and Immigration Services ("USCIS") in 1996. From 2006 to October 2016, Jimenez was an Immigration Officer in the National Security Branch/Division of the Fraud Detection National Security Directorate ("FDNS") of USCIS. Plaintiff's Statement of Material Facts ("PSOMF"), ECF No. 66-1, at ¶ 1. FDNS's mission is to determine whether individuals and organizations applying for immigration benefits might pose a national security risk. PSMOF ¶ 3.

Given their national security implications, FDNS cases sometimes involved classified information. One of the systems used in DHS to store and share such information (up to the "secret" level) is the Homeland Security Data Network ("HSDN"). PSMOF ¶ 5. To be granted access to HSDN—or any classified records system—an employee must have (i) the appropriate level of security clearance, (ii) a current or imminent "need to know," and (iii) the ability to safeguard the accessed information. PSMOF ¶ 4. Jimenez was granted access to HSDN in 2012 due to his work responsibilities. Plaintiff's Opp. at 3, ECF No. 66.

In 2014, Jimenez began a two-year temporary detail with INTERPOL. While on detail, his access to HSDN was automatically suspended because he had not logged into the system in 30 days. Opp. at 1–2; DSMOF at ¶ 3 n.2. In 2015, Jimenez's INTERPOL detail was abruptly terminated (approximately 15 months early) and he returned to his job at FDNS on June 17, 2015. PSMOF at ¶¶ 4–6. The record indicates Mr. Jimenez's detail was terminated early because of a concern that he violated INTERPOL's policy on dissemination of sensitive information. PSMOF ¶ 18; Def's Ex. 10 (email from Bernard Graham).

From August 2015 to October 2016, Jimenez continued to work on immigration cases for FDNS. During this time, Michael Tennyson, FDNS's Case Resolution Branch Chief, and

Matthew Mooney, the Deputy Chief, were giving Jimenez his work assignments instead of his usual supervisor, Shari Golston.  PSOMF ¶ 7.  Jimenez's assignments included "reviewing draft policies, performing security checks for certain immigration benefit cases . . . and performing work for FDNS's Senior Leadership Review Board ('SLRB')."  Id.[1]  In addition to those duties, Tennyson asked Jimenez to attend the SLRB meetings, take notes at those meetings, and look at the cases under review "from an immigration officer perspective."  Id.  Tennyson explained that this meant reviewing the cases to find immigration violations without regard to classified information.  Def's Ex. 7 at 40, 44 (Tennyson Dep.), ECF No. 62-3.

About two weeks after Jimenez returned to work for FDNS, he submitted a form to his supervisor Shari Golston asking that his access to HSDN be restored.  PSOMF ¶ 19.  After receiving Jimenez's request, Golston emailed Tennyson to ask whether Jimenez's current work assignments required HSDN access.  PSOMF ¶ 21.  Tennyson responded a few minutes later saying that Jimenez's work did not require HSDN access.  PSOMF ¶ 22; Def's Ex. 12 (email exchange).  Golston relayed that conclusion to Jimenez.  PSOMF ¶ 23.  Jimenez replied, stating that he did in fact need HSDN access to review classified information.  PSOMF ¶ 24.  Matt O'Brien, Chief of the National Security Division of FDNS and Jimenez's second-line supervisor, was added to the email chain.  Def's Ex. 11; PSOMF ¶ 25.  O'Brien replied to all, writing, "Rolando . . . Your current assignment does not require access to the HSDN. Accordingly, your request is denied."  Id.

---

[1] The Senior Leadership Review Board is an advisory panel within USCIS tasked with reviewing highly sensitive immigration cases.  PSMOF ¶ 8.  The SLRB sometimes met as frequently as once per week, but it did not always meet that often.  Def's Ex. 6 at 23 (O'Brien Dep.).

In addition to believing that Jimenez's work assignment did not require HSDN access, O'Brien had also been advised by his supervisor—Matthew Emrich, the FDNS Deputy Associate Director—that because of INTERPOL's ongoing investigation into Jimenez's possible misconduct, he was not to be "given access to any data systems to which he did not already have access"  PSOMF ¶ 18; Def's Ex. 2 (O'Brien Responses); Def's Ex. 10 (email from Bernard Graham at INTERPOL).

Jimenez's evaluations for both FY 2015 and 2016 were positive.  In both years, he achieved the highest overall rating available—"Achieved Excellence."  PSOMF ¶¶ 28, 30.  In his self-assessment for FY 2015, Jimenez offered no indication that his lack of HSDN access inhibited his ability to complete his work.  PSOMF ¶ 26.  His self-assessment for FY 2016 likewise failed to suggest that he needed HSDN access to complete his assignments.  PSMOF ¶ 27.  Aside from Jimenez's first request for HSDN access in August 2015, the record contains no emails or other correspondence from Jimenez to his supervisors informing them that lack of access was impeding his ability to complete his work assignments.  PSMOF ¶¶ 24, 26, 27.

In October 2016, Jimenez began working as an Immigration Officer in DHS's Immigrant Investor Program Office, the position he currently holds.  PSOMF ¶ 2.  Jimenez agrees that he no longer needed HSDN following the transfer.  PSMOF ¶ 12.

## II. Legal Standards

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if a reasonable factfinder could find for the non-moving party, and a fact is "material" if it can affect the outcome of litigation.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute about a material fact is not 'genuine' unless

'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Ward v. McDonald, 762 F.3d 24, 31 (D.C. Cir. 2014) (quoting Mogenhan v. Napolitano, 613 F.3d 1162, 1165 (D.C. Cir. 2010)).  Mere speculation is insufficient to defeat summary judgment.  Morris v. McCarthy, 825 F.3d 658, 674 (D.C. Cir. 2016); see Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) (stating that conclusory assertions and unsubstantiated allegations do not establish genuine issue of fact).

"[R]etaliation claims are subject to the familiar, burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Walker v. Johnson, 798 F.3d 1085, 1091 (D.C. Cir. 2015).  "First, a plaintiff must establish a prima facie case of retaliation; if she meets that burden, the employer must articulate a legitimate nonretaliatory reason for its action; finally, the plaintiff has the ultimate burden of establishing that the reason asserted by the employer is pretext for retaliation."  Holcomb v. Powell, 433 F.3d 889, 901 (D.C. Cir. 2006).

### III. Analysis

#### A. Jimenez Has Not Established A Prima Facie Case of Retaliation

Jimenez contends that the decision to deny his request for HSDN access was a reprisal for his earlier protected EEO activity.  In particular, Jimenez filed an EEO Complaint against his supervisor, Shari Golston, in April 2015, while he was still on INTERPOL detail.  Opp. at 4. Jimenez argues that O'Brien's denial of his request to access HSDN in August 2015—nearly four months later—was retaliation for his filing of this complaint against Golston.  Opp. at 2. Jimenez cannot survive summary judgment on this claim because he cannot establish that the denial of HSDN access was a materially adverse action.

To make out a prima facie case of retaliation, the plaintiff must establish that he "[1] engaged in activity protected by Title VII; (2) the employer took an adverse employment action

5

against her; and (3) the adverse action was causally related to the exercise of her rights." Holcomb, 433 F.3d at 901–02. "With respect to the third element—causation—'Title VII retaliation claims must be proved according to traditional principles of but-for causation.'" Webster v. U.S. Dep't of Energy, 443 F. Supp. 3d 67, 78 (D.D.C. 2020) (quoting Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)).

In this context a materially adverse action is one that is "harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53, 68 (2006); see Baird v. Gotbaum, 662 F.3d 1246, 1249 (D.C. Cir. 2011) ("[A]ctions giving rise to [retaliation] claims . . . reach any harm that well might have dissuaded a reasonable working from making or supporting a charge of discrimination.") (internal quotation marks omitted).

When it denied DHS's motion to dismiss on this claim in Jimenez I, the Court said:

> It's true that "minor 'inconveniences'" like delayed computer access or similar workplace impediments generally do not constitute adverse actions. See Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting Stewart, 275 F.3d at 1135). But here, Jimenez has alleged that he has not had access to the HSDN *since 2015*. Accepting his allegation that he needs access to the database to perform his job, four years of being denied it strikes the Court as going beyond mere inconvenience and rising to an adverse action for purposes of a retaliation claim.

Jimenez I, 395 F. Supp. 3d at 40.

Discovery since that opinion was issued has revealed important facts that are not in dispute. First, Jimenez agrees that when he was reassigned to the Immigrant Investor Program Office in October 2016, he no longer needed HSDN access to complete his work assignments. PSMOF ¶ 12. The relevant time that he lacked HSDN access is therefore, at most, fourteen months. Id.; Mot. at 12. Second, Jimenez's supervisors did not think he needed access to HSDN to complete the work assignments they gave him. See Def's Ex. 11 (email from O'Brien), Def's

6

Ex. 12 (email from Tennyson). In particular, Tennyson (who was assigning Jimenez work at the time) explained that Jimenez's duties included reviewing the SLRB cases for immigration violations *without* regard to classified information. Def's Ex. 7 at 40, 44 (Tennyson Dep.). Third, Jimenez received excellent performance evaluations during the time in question, despite his lack of HSDN access. At no point did Jimenez indicate to his supervisors that his inability to access HSDN was making it more difficult to complete his work assignments, and his evaluations did not appear to suffer because of his lack of access. Mot. at 6–7.

Nevertheless, Jimenez argues that he *did* need HSDN access to complete his assignments, and that he had to engage in "work arounds" to access HSDN information by asking coworkers to view information on HSDN for him. Opp. at 5. When asked how many times "he ask[ed] someone to access HSDN" for him, he responded "all the time." Def's Ex. 3 at 70 (Jimenez Dep.). However, Jimenez has provided no evidence of specific projects or instances when he needed HSDN access, aside from his own testimony that he generally needed access to complete his work for the SLRB. Mot. at 6–7. If that were the case, corroborating evidence in the form of emails or testimony from colleagues would have been easy to obtain. Jimenez listed three colleagues, John Garbinski, Matt Mooney, and Melissa Merkovich as coworkers that checked HSDN for him. Id. at 71. Yet, Jimenez did not seek to depose these coworkers to corroborate his memory, or seek any emails in which he asked them for help, or produce any of his work product showing HSDN information he obtained from someone else. Jimenez also failed to identify any specific task or assignment for which he needed HSDN access during his deposition. Def's Ex. 3 at 135–36, 140 (Jimenez Dep.).[2]

---

[2] Jimenez maintains that he has described these interactions "with as much specificity as reasonably possible, given security concerns," but he cannot provide any specific case for which

The government argues Jimenez's testimony in this regard is insufficient to create a genuine dispute of material fact because his assertions are "conclusory" and "uncorroborated and/or contradicted by other record evidence." Reply at 1–2. But, a plaintiff's affidavit, even if self-serving and uncorroborated, can be enough to create a genuine dispute of material fact if it "sets out facts that would be admissible in evidence." Camara v. Mastro's Restaurants LLC, 952 F.3d 372, 374–75 (D.C. Cir. 2020). While perhaps not the most persuasive to a jury, Jimenez's unilateral testimony that he asked colleagues to access HSDN for him "all the time," Def's Ex. 3 at 70, would be perfectly admissible. The Court therefore must credit it for the purposes of summary judgment.

However, even taking Jimenez's testimony as true, he has not shown that lack of access to HSDN was more than a minor inconvenience. According to Jimenez, he was able to access the same information through colleagues and was not penalized for any issues stemming from his lack of HSDN access in either his FY 2015 or FY 2016 performance reviews. Therefore, Jimenez's claimed lack of HSDN access, on this record, was no more than a "minor inconvenience" that does not rise to the level of a materially adverse action. Taylor, 571 F.3d at 1321; see Durant v. D.C. Gov't, 875 F.3d 685, 698 (D.C. Cir. 2017) (denying correctional officer's request for a government vehicle not a materially adverse action because the plaintiff "did not provide evidence . . . that his inability to access a vehicle [led to] . . . instances in which he could not complete a particular assignment."); Freedman v. MCI Telecomms. Corp., 255 F.3d 840, 847 (D.C. Cir. 2001) (employer's refusal to provide certain tools plaintiff claimed he

---

he needed HSDN access. Opp. at 13. Even considering the potential for classified information, Jimenez could have deposed his colleagues whom he supposedly often asked for help without revealing confidential or classified information.

needed to perform his job was not material adverse action where plaintiff "would only occasionally need tools in order to perform [the assigned] tasks"). Also, tellingly, Jimenez admits that he never advised Golston or Tennyson that he allegedly relied upon coworkers to retrieve HSDN data to complete his assignments. See PSOMF ¶ 24.

Finally, Jimenez's subjective feelings that his job was in jeopardy without access to HSDN are not enough to support a Title VII retaliation claim. Jimenez says that he "did not know how he would be rated" in FY 2015 and felt "extremely anxious" about his job. Opp. at 17. He adds that he "did not know if his continued non-access to HSDN and forced reliance on co-workers would be held against him as time progressed." Id. Regardless of Mr. Jimenez's personal feelings, the standard is whether his employer's action would have dissuaded a "reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68; see also Leach v. Nat'l R.R. Passenger Corp., 128 F. Supp. 3d 146, 157 (D.D.C. 2015) (Cooper, J.) ("[A] Title VII retaliation claim may be predicated on the subjective reactions of a reasonable worker," but the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse."). No reasonable employee would have felt dissuaded under these circumstances, especially given that Jimenez's supervisors told him explicitly HSDN access was not required to do his job, and his performance evaluations during the time reflected the highest ratings.[3]

---

[3] Jimenez's rating cycle ended on September 30, 2015, and he received his FY 2015 evaluation on November 4, 2015. Def's Ex. 17 (FY2015 Performance Appraisal). Thus, any uncertainty Jimenez had about his performance rating lasted a few months at most. See Pl's Opp. at 17 (acknowledging that his FY 2015 assessment was based on just two months of work in August and September).

9

B. <u>Jimenez Cannot Establish that Defendant's Stated Motive was Pretextual</u>

Even if Jimenez made out a prima facie case of retaliation, summary judgment is appropriate for a second reason: Jimenez has failed to rebut his employer's legitimate, non-retaliatory reasons for denying his HSDN access request.

Once the defendant has come forth with a legitimate, nonretaliatory reason for the adverse action, the "[p]laintiff must then satisfy his burden to establish an inference of pretext, and he can only survive summary judgment if he also provides sufficient evidence to show that retaliation was the 'but-for cause' of the alleged adverse actions." <u>Morales v. Gotbaum</u>, 42 F. Supp. 3d 175, 197 (D.D.C. 2014) (quoting <u>Nassar</u>, 570 U.S. at 362). "[T]he issue is not 'the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers." <u>Fischbach v. D.C. Dep't of Corr.</u>, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

The government provides two nonretaliatory reasons for why Jimenez's HSDN request was denied: (1) that his supervisors did not believe he needed access to the system to complete his work assignments, and (2) that at the time his HSDN access request was denied, Jimenez was under investigation for a potential violation of INTERPOL's policies concerning dissemination of sensitive information. PSOMF ¶¶ 12, 18. Jimenez has not established an inference of pretext for either reason.

Starting with the first. Although Jimenez clearly disagrees with Tennyson's view that he did not need access to HSDN to complete his assignments, Jimenez points to nothing in the record suggesting that Tennyson did not honestly believe that Jimenez did not need access to HSDN to complete his assignments. Jimenez also does not dispute that HSDN is a "need to know" system, meaning it would be inappropriate for a supervisor to grant access unless the employee has an immediate "need to know." Mot. at 16; Def. Ex. 4 at 52–53 (Emrich Dep. Tr.)

(HSDN access should not be granted based on a mere possibility that the employee might need access for a future assignment). Jimenez never disabused his supervisors of this impression. At no point after his initial request in August 2015 did Jimenez tell Golston or Tennyson that he had to ask coworkers to gather information for him. PSMOF ¶ 24. Therefore, Jimenez cannot show that his employer did not "honestly believe its proffered explanation." Morris, 825 F.3d at 671.

Second, at the time Jimenez's HSDN access request was denied, he was under investigation for a potential violation of INTERPOL's policies concerning dissemination of sensitive information. PSOMF ¶ 18. Emrich testified that he became aware of Jimenez's possible violation and spoke with O'Brien about it around June 17, 2015. Def's Ex. 24 at 18–20 (Emrich Dep.). Emrich explained that he instructed O'Brien not to grant Jimenez access to any new data systems because "[i]f someone has potentially violated policy concerning the unauthorized disclosure of information, then the more types of information they have access to, the more that they could possibly disclose in an unauthorized fashion." Id. at 24–25; see also Def's Ex. 6 at 70–71 (O'Brien Dep.) (explaining that when "there was an allegation that hadn't been proven . . . there was no reason to restrict access to existing systems. However, on the basis of the allegation, it did create a concern about usage of . . . systems that he had not previously had access to.").

Jimenez argues this explanation is pretext because Emrich did not have information about the alleged policy violation, did not investigate which systems Jimenez had access to at the time, and did not "direct anyone else to review Plaintiff's security clearance." PSOMF ¶ 18; Opp. at 20. Jimenez seems to be arguing that Emrich should have taken *more* security measures after his alleged policy violation at INTERPOL. This critique amounts to no more than a claim "that h[is] employer made a bad decision," which is insufficient to defeat summary judgment. Morris, 825

F.3d at 671. The fact that Jimenez thinks his supervisors should have acted differently does not create the inference either Emrich or O'Brien did not honestly rely on their stated rationale.

Furthermore, Jimenez does not claim that Emrich knew of his prior EEO complaints. See Def. Ex. 24 at 46 (Emrich Dep.) (Emrich responded "no" when asked if he was aware at the time that "Mr. Jimenez had filled an EEO complaint about Shari Golston and Matt O'Brien"). It is well-established that the defendant is entitled to summary judgment where "[t]here is no evidence . . . that any of the decision-makers involved in the [challenged] acts harbored any discriminatory or retaliatory animus." Ball v. Tanoue, 133 F. Supp. 2d 84, 91–92 (D.D.C. 2001). Jimenez cannot establish that Emrich's rationale for giving this instruction was pretextual when Emrich had no knowledge of Jimenez's EEO activity.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment. A separate Order shall accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: March 1, 2022